# UNITED STATES, Plff.,

*v.*

# PORTO RICO RAILWAY, LIGHT, & POWER COMPANY, Dft.

San Juan, Law, No. 1039.

### EJECTMENT FROM PUBLIC PROPERTY.

Treaty of Paris—Property Rights in Ceded Territory—Judicial Knowledge.

1. The United States, in succeeding to the rights of Spain under the treaty of Paris, did so without prejudice to the rights of citizens and property owners, and is bound to respect all their existing rights of private property, and this would be so apart from treaty stipulations. Courts will take judicial notice of the duties of officers of the former government, and construe official papers.

Statute of Conformity—Ejectment.

2. Under the Statute of Conformity the Federal Court shall conform as near as may be to the procedure provided by the local law, but the Statute of Conformity does not apply if there is no satisfactory method of procedure under the local law. Ejectment and unlawful detainer are alternative, and not exclusive, remedies, and the existence of a summary procedure merely gives the landlord an election, and does not deprive him of his common-law remedy of ejectment.

Government Grants Leases.

3. A grant by the government can be declared forfeited only by the proceeding called "office found," or by legislative authority which is its equivalent, but a lease is not technically a grant, and the landlord may proceed in ejectment.

Cession of Land—Franchise.

4. While the government of Spain leased to Ubarri certain land to be used as a tramway terminal for the same period for which it had granted him a tramway franchise, the United States, as the

United States v. Porto Rico Railway, L. & P. Co.

successor of Spain, might recover the rental for the land without affecting the franchise.

Contracts—Mutuality—Rent.

5. It is a principle of general law that a contract must be mutual unless the contract itself provides otherwise as to any particular term. Ordinarily the amount of rent must be certain or capable of reduction to certainty, and when this is not so a landlord can recover the value of the use and occupation.

Sovereignty—Exemption from Suit—Estoppel.

6. While it is true that the sovereign cannot be sued without its consent, when it chooses to sue it is subject to the incidents of the suit, and is bound by estoppel the same as other parties.

Estoppel at Law—Estoppel in Equity.

7. It is not clear that estoppel in pais is binding at law as to land, although it is binding in equity; and in no event does estoppel arise unless the silence or acquiescence of one party is acted upon by the other.

Pleadings—Admissions.

8. Where the plaintiff fails to put in any evidence showing the amount of land for which it seeks recovery of rentals, it can recover only upon the amount admitted by the defendant.

Opinion filed January 20, 1917.

---

## Finding of Facts.

### Pleadings.

The complaint was filed in this case July 1, 1914, answer followed July 28, and later came stipulation waiving a jury.

The pleadings cover lands in San Juan, Porto Rico, within the ward of the Marina known as La Carbonera, as follows:

"II. Said property is bounded on the north by Recinto Sur; beginning at the southeast corner of Recinto Sur and Tanca street, thence extending sixty-one (61) meters east on Recinto

United States v. Porto Rico Railway, L. & P. Co.

Sur; thence in a southerly direction at an angle of ninety (90) degrees with Recinto Sur a distance of forty and sixty-six hundredths (40.66) meters to Comercio street; thence in a westerly direction at an angle of eighty-eight (88) degrees, forty-seven (47) minutes, on Comercio street a distance of sixty-one and three hundredths (61.03) meters to the intersection of Comercio and Tanca streets; thence in a northerly direction a distance of thirty-nine and thirty-seven hundredths (39.37) meters at an angle of ninety-one and thirteen hundredths (91.13) degrees to the southeast corner of the intersection of Tanca street and Recinto Sur, the starting point, containing approximately two thousand and seventy-four (2,074) square meters."

The wrongful withholding of the land and its value of $1,000 are alleged. The defense admits possession of so much of said land as is described as follows:

"A tract or parcel of land comprehended within the parcel described in paragraph II. of said complaint and containing approximately 1,248.24 square meters,—bounded on the south by Comercio street, for a distance of 52.97 meters; on the east by the said tract described in paragraph II. of the complaint, for a distance of 24.81 meters; on the north, for a distance of 52.97 meters by the said tract; and on the west, for a distance of 13.26 meters, by the said tract, and for a distance of 15.29 meters by a tract of land belonging to the municipality of San Juan."

Jurisdiction of this court of the parties and the subject-matter is conceded.

But the defendant denies that it wrongfully withholds the property because it claims possession and usufruct thereof under

a concession for a tramway granted to Pablo Ubarri by Royal Order of February 18, 1878, for a term of sixty years, the particular land in question having been granted Ubarri January 21, 1881, for a station and coal yard for the same length of time. These concessions the defendant claims were ratified by the plaintiff itself after its acquisition of the land under the treaty of Paris, December 10, 1898, and under circumstances which defendant claims amount to an estoppel.

The case came on for trial on the merits March 21, 1916, when the answer was amended and stipulation entered agreeing to certain facts. Documentary and oral evidence was introduced, and the case was concluded on March 25. Briefs were filed during the summer, and by agreement the case was submitted for decision.

### Spanish Officials in Porto Rico.

It is essential to outline the method of Spanish government in Porto Rico, and this can be supplied from the papers on file, aided by judicial notice of matters of common knowledge. Since 1876, and indeed at intervals since 1812, there has been a written Constitution in force in Spain, and the limits of the legislative, judicial, and executive departments were carefully defined. Legislation was confined to the Cortes, meeting at Madrid, to which, however, Porto Rico sent no delegates except to the Provisional Cortes of 1812 and during the short-lived Spanish Republic. The judiciary in Porto Rico consisted of trial courts of first instance, and an audiencia, which acted as a court of appeal; but the proceedings at bar did not come before the local courts. They were exclusively before the executive departments. The King, represented during the minority of Al-

fonso XIII. by his mother as Regent, was the head, assisted by different ministers, of whom those of war and colonies (Ultramar) concern this case. The Minister of War was Azcarraga. In Porto Rico the chief official on the civil side was called governor general and on the military side was called captain general, but both positions were held by one man. During the period now in question Eulogio Despujols and after him Daban, who lived and had offices in the Fortaleza or Palace, filled this double office. Under him were several departments, such as (1) the Secretaria del Gobierno General, whose chief, the secretario, was M. de Setien (his office was on the ground floor of the Fortaleza); (2) Negociado de Obras Publicas, or department of public works, under a chief engineer; (3) Construcciones Civiles, embracing also forests and mines, of which Angel Vasconi was chief engineer (whose office was in the Fortaleza); (4) Jefatura or Direccion de Obras Publicas, under a chief engineer, Don Manuel Maese, in charge of public works and works undertaken by private corporations (this had its office in the building on Fortaleza street, through which was to be the entrance to the United States court); (5) Comandancia Exenta de Ingenieros, or corps of military engineers (with offices in Casa Blanca), having charge of all work of military nature and of military zones; (6) the Intendencia, which occupied the present Intendencia on the Plaza Principal, under Nicolas Alcazar, and also Cabezas, as Intendente General de Hacienda. By the Ordenanza in 1803 the governor was also Intendente, but the Intendencia was separated by Royal Order of November 28, 1811, an arrangement which continued despite the revolutions which followed. The Intendencia General de Hacienda had several subdivisions. (a) There was an administrador central, a

second chief, who during this time was Angel Lozano and afterwards Mæstre. (b) Administracion local, under the administrador local. In this branch were Luis de Sanquirico, Rafael Calvera, and Maximiliano Power as collector of customs, Jose Mendez, contador or accountant, Evaristo Alcala del Olmo, accountant, and Domingo Lobato, customhouse appraiser. The administrador local was the collector of customs, including rents, censos, and other revenues. (c) Intervencion, under an interventor or auditor, who was Francisco Romera and afterwards Jose Mendez de Arcaya. (d) Negociado de Bienes del Estado, represented by Manuel Montoto. There were other bureaus which it is not necessary to notice, and these officials were themselves in different classes, as from the first to fifth grades, which, however, was independent of their respective offices.

### *Tramway.*

It is agreed and shown that Pablo Ubarri filed the necessary papers for the construction of a tramway from San Juan to Rio Piedras, and the minister of the colonies on February 18, 1878, transmitted the Royal Order thereon to the governor general of Porto Rico. The order was duly filed in that bureau, which concerns forests and mines and civil constructions. It provided that the track be laid upon the right-hand side of the road, flush with the streets, with bridges at Caño San Antonio and Martin Peña, the motive power to be steam motor, "unless it should cause the slightest inconvenience to persons or horses." There were careful specifications involving laying the roadbed, construction of stations under proper authority, maintaining the macadam and ditches, bond and final inspection, all as provided

for by the Decree Law of November 14, 1868, concerning public works, forfeiture following noncompletion of the works in proper time and manner. The term of the concession was sixty years in accordance with the provisions of the Decree Law of November 14, 1868, as well as those of June 5, 1859, as amended by the Law of June 15, 1864, as well as municipal ordinances, "the tramway being considered as one more vehicle traveling upon the public highway." The maximum speed should not exceed 15 kilometers per hour, to be reduced to 6 kilometers on road and highway crossings. In 1882 there was a modification of the plans, which also permitted condemnation proceedings in accordance with the general law of public works of May 21, 1881, together with the right of exemption from customs duties on material destined for the new line in accordance with the provisions of the Royal Decree of October 28, 1868, and the Royal Order of October 28, 1880. There were subsequent proceedings connected with the operation of the railroad not necessary for consideration.

## San Juan.

At the time of these proceedings, San Juan, the capital of Porto Rico, was a walled city occupying the west end of the Island of San Juan, bounded by the ocean on the north, the harbor of San Juan on the south, the main entrance by the fort called El Morro on the west, and the smaller entrance known as Caño de San Antonio on the east, guarded by Castillo de San Geronimo. This caño was spanned by a bridge carrying the Military Road or Carretara, built from San Juan over the mountains to Ponce on the south side of the Island. At the Caño de San Antonio the island of San Juan was defended by a first

line of defensive fortifications, and the proposed railroad passed along the marsh at their southern edge. These extended to the ocean on the north at San Geronimo, and ran along the sea westwardly to a second and third line of defense, both of which were cut by the proposed railroad of Ubarri as it went westwardly parallel with the Carretera towards the city proper.

San Juan formed a rough rectangle, with Morro at the northwest corner, San Cristobal at the northeast corner, the Fortaleza or Governor's Palace near the southwest corner, and the battery of San Francisco de Paula on the sea side near the southeast corner. The two longest streets in San Juan were Fortaleza running eastwardly from that palace, and San Francisco from the western gate called Puerta de San Juan past the Plaza to Puerta de Santiago in the eastern wall below Castillo San Cristobal. South of San Francisco and extending to Fortaleza street was a plaza originally named Santiago and from 1903 renamed Plazuela Colon, from Christopher Columbus, just within Puerta de Santiago. This from its being the land entrance to San Juan was also known as Puerta de Tierra. There the streets merged in the Carretera to Ponce. There were a number of cross streets north and south, but they ended with the walls on the ocean and harbor sides, with the exception of San Justo, which passed through San Justo Gate down to the long tongue of land called the Marina, jutting out into the harbor, and Calle de Tanca which passed through the Puerta de España, descending by an incline outside the gate to the Carbonera or coal yard and dock on the harbor side of Comercio street in the Marina district. Between the houses outside of Comercio and the walls lay a piece of land, divided into lots, amongst which were the locus in quo of this suit.

United States v. Porto Rico Railway, L. & P. Co..

## *Lease.*

Ubarri's railway was not permitted to enter the city proper, but ran from the east in the Carbonera district along the south side of the walls, and terminated at the Puerta de España. Here was accumulated his material for building the road, combustibles and the like. Being in the military zone, all this part of the Marina was under the control of the Ministry of War, which had platted it off into lots on July 22, 1849. In 1872 the treasury or bureau of state properties of Porto Rico obtained the property from the War Department by Royal Order of April 8, and had been in uninterrupted possession, renting it at an annual rental, free of all charges except those to which it was subject by the prescriptions of the War Department. Ubarri occupied the property under a Royal Order of January 21, 1881, issued by the Ministry of War, as follows:

"In view of the communication of your Excellency number 435, addressed to this Ministry, dated November 9th, of last year, accompanying a petition of Don Pablo Ubarri, resident of that capital, and owner of the steam tramway between said capital and Rio Piedras, asking permission to build a station and a deposit of combustibles for the service thereof, on lands of the military zone, his Majesty the King, whom God may keep, in conformity with the report of the Director General of Engineers, has been pleased to grant it under the following conditions:

"First: There shall not be used in the construction of buildings other materials than wood or iron.

"Second: Their height shall not only be lower than that of the walls, but sufficiently low so as not to obstruct the fire of the guns from above.

"Third: That there shall be left between the walls and the buildings a street not less than 10 meters wide.

"Fourth: That the buildings shall be at all times subject to the general provisions of the Royal Order of February 13, 1845.

"Fifth: That the works shall commence within a year from the date of the concession the same to be forfeited if said condition should not be complied with or the works not finished within one year from the time of their commencement; and,

"Sixth: That the lots should not be ceded gratuitously, but they are to be leased under such conditions as may be deemed to be acceptable, turning into the Insular Treasury the rent as contingent revenues thereof. (6. Que los solares no se cedan gratuitamente sino que se arrienden en las condiciones que se júzguen aceptables, ingresando el alquiler en el Tesoro publico de esa isla como productos eventuales del mismo.)

"At the same time it is the will of his Majesty that your excellency be authorized to make the proper orders to carry into effect the said lease. By Royal Order I communicate it to you for your knowledge and further action. Which I communicate to you for proper action."

Captain General Despujols communicated this to the Governor General for proper action, and Alcazar referred it in turn to the central administrator, and Lozano referred it to the local administration to ascertain whether the station or deposit allowed is located on the lands of the Hacienda Publica. Cabrera for the local administration reported that he had no documents, and the matter seems to have been dropped until 1885.

By that time the railway enterprise had advanced so far that the public authorities thought it time to collect rent for the land now in suit, i. e., lots 15–27, and, after similar references

and reports, it was taken in hand by the department of public works. In order to find a basis of this assessment the value of lots 1 to 4 of the Carbonera was investigated by similar reference backwards and forwards between several bureaus, and this was ascertained to be 4 pesos per square meter. Captain General Daban on October 2, 1885, got at the same result in a different way, and estimated the value of the land as 16,724 pesos, upon which he estimated 9 per cent as proper return, and so fixed the rent at 1,505.16 pesos. Nevertheless, he concluded that this assessment was high, inasmuch as the land and buildings were subject to military restrictions. The central administration therefore further investigated the matter, and in October, 1885, fixed upon the rent for these lots 15 to 27, with an area of 4,181 square meters, at the usual rental rate of 5 per cent, making 836.20 pesos per annum, say 3,344.80 pesos up to June, 1885, without interest. This figure, however, was "without prejudice to alter the same at such future time as the servitudes and restrictions to which those lands are now subject may either disappear or be diminished, making possible to build there." The 5 per cent basis was adopted inasmuch as it was the official rate for all leases.

Finally, the following directions were given:—

To the Local Administrator of Customs and Revenues,

City.

Porto Rico, December 21, 1885.

The Chief of the Bureau of Public Works in a communication addressed to his Excellency the Governor General, on the 2d inst., transmitted by his excellency in 15th of the same month to his Excellency the Treasurer, as a result of the in-

quiry made with reference to the value which should be given to the lots of the "Carbonera" from numbers 15 to 27, that is, the space occupied by his Excellency Don Pablo Ubarri for the tramway between this capital and Rio Piedras lying south of the wall on the left-hand side coming out from the Gate of Spain, with an area of 4,181 square meters, has assessed the same in the sum of 3,135 pesos, 75 cents, so as to fix the rental value of the same for the time being without prejudice to modify it at such a time when the military easements to which they are subject may be either removed or diminished and made available for building purposes.

Consequently, his Excellency the Intendente General (General Treasurer) has been pleased to order, and hereby orders, that office to make a record in its books of said rental, and that steps be taken to collect any amount due or to become due, fixing the date on which the lots are to be turned over to the grantee, and to forward to this office a copy of the liquidation, the same to be attached to the proceedings.

God, etc.,      Montoto.

(La Jefatura de Obras Publicas en comunicacion que dirige al Excmo. Gobernador General, en 2 del corriente, trascrita por su Excelencia en 15 del mismo, al Excmo. Sr. Intendente, resulta de la consulta hecha acerca del valor que deberia fijarse a los solares de la Carbonera, numeros 15 al. 27, o sea el espacio ocupado por el Excmo. Sr. Don Pablo Ubarri, para el tramvia entre esta Capital y Rio Piedras en la parte sur de la muralla a la izquierda saliendo por la puerta de España con una superficie de 4181 metros cuadrados, ha valorado este en la cantidad de $3,135.75 para que sirva para determinar el canon de arrendamiento en la actualidad, sin perjuicio de que se modifique el dia

United States v. Porto Rico Railway, L. & P. Co.

en que desapareciendo o disminuyendo las servidumbres militares a que los terrenos estam sujetos sea posible en ellos la edificacion.)

The net result was therefore that in December, 1885, there was a "liquidation made in the accounting division of the local administration of the amounts due by his Excellency Don Pablo Ubarri for rent on the lot situated in the Marina, place called La Carbonera, Nos. 15 to 27, that is the space occupied by the tramway between this capital and Rio Piedras on the southern portion of the wall at the ascent of the Puerta de España," at the rate of 156.78 pesos for the years 1882, 1883, and 1884, amounting to 470.34 pesos, and the same amount of 156.78 pesos for 1885. When steps were taken to collect, however, Ubarri had a talk with the Intendente General, and after several references and reports the matter was held up until the Ministry of Colonies at Madrid could pass upon the question whether he was not exempt from taxes under the provision of the Railroad Law as to Public Utilities. The local government finally decided that, inasmuch as any declaration on the subject could hardly be retroactive, there was no reason to hold up the matter further; and so on September 18, 1886, Ubarri finally paid into the local administration of revenues and customs in government securities, coupons, and 12 cents in cash, the sum of 627 pesos and 12 cents for the fiscal years from 1881 to 1885, and this was passed through the books of the proper subdivisions of the Intendencia. In the records of the central administration of taxes and rents of state property expediente or file No. 1231 shows that in 1885 the property in question was inscribed as No. 48, and similar inscription was made for 1887 by the regis-

trar of property at San Juan.   The papers also show similar payments of Ubarri of rent for the fiscal years 1886–7, 1887–8, and 1888–9, and it is agreed this continued until 1912.

## *Terminal.*

Spanish laws of the year 1815 and subsequently provided for the establishment of military zones.   A Royal Order of February 13, 1845, specified conditions to be fulfilled in proceedings for constructions in military zones of fortified cities.   This grew out of a permit of a commandant of the naval station of Porto Rico, granting to a resident the right to enlarge a building of his own.   Up to that time there had been delays growing out of applying to the home government, and so on January 24, 1851, the Order of 1845 was, by the Queen, extended to Porto Rico.

This provided the procedure to be pursued, beginning with a petition to the military governor, with drawings of the proposed building, superficial and elevation, to be referred to the engineer corps, who should report to the captain general.   There was to be a further examination by engineers and recommendation to the department of colonies for proper action by her Majesty. After grant made, the execution was to be supervised by the engineer corps.   Careful plans were preserved, and the building was subject to demolition for military reasons.   The 6th provision of this Royal Order is as follows:

"The permits referred to in the preceding article shall not and must not be considered as new possessory titles in favor of the owners, neither shall they modify in any respect the particular conditions specified for the construction of said buildings at the time of their approval by her Majesty, and much less shall they modify the essential and general condition compelling all the owners of buildings erected on military reservations of for-

United States v. Porto Rico Railway, L. & P. Co.

tified places and strongholds to demolish the same at their expense without right to indemnity or reimbursement whenever the service of the state shall demand it and due notice be given them by the proper military authority."

Ubarri had now built his road. The Royal Order of 1881 had contemplated his erecting buildings when his railway had its terminal turntable and switches, but the term allowed had expired. The San Juan station or terminal used was in a building between Comercio street and the shore (apparently the present Ochoa store, still crowned by Ubarri's bust.) To build at his track terminals Ubarri needed a further permit, and so in 1891 he petitioned for the right to construct a station of iron and wood, giving plans, at the east of the Puerta de España, in the fortified area in the ward of the Marina, formerly the Carbonera, which he had under lease, and which was part of military zone No. 1. Royal Orders of November 13, 1883, and September 6, 1887, had already fixed the limits of this ward, subject to no other restrictions but those provided in municipal ordinances, but the land in question could not be sold. Upon examination by the engineer corps of Porto Rico, it was reported January 29, 1891, that the masonry buildings already erected nearer the sea were higher than the building Ubarri proposed, and indeed higher than the line of fire from the works, and so the major commanding said that there was no objection to making the grant for terminal building requested in accordance with Royal Order of May 5, 1881. This report made the conditions that (1) the building should be 10 meters from the wall, and demolished when required by the military without indemnity; (2) to be of wood or iron in accordance with plan attached, and the construction to be carried on under supervision of the en-

IX. Porto Rico.—24.

gineers; and (3) "that this construction shall in no manner affect, nor give any right of title upon, the land, which is the property of the state." The colonel, chief of staff, granted a temporary permit, and favorably transmitted the petition February 5, 1891. The permit was confirmed by order of "the King whom God may keep, and in his name by the Queen Regent of the Kingdom" April 25, 1891, transmitted to the captain general of Porto Rico by War Minister Azcarraga. This contained the following conditions:

1. The building shall be separated from the wall, and the work shall be carried out in accordance with the plan attached to the petition, the said building to be demolished without any right to indemnity, when on account of the necessities of the defense it be so required by the military authorities.

2. The structure shall be built of wood or iron, and its construction shall be carried on under the supervision of the Engineer Corps.

3. This concession shall in no way affect the property rights over the land, which continue belonging to the state.

4. It shall be always subject to the general provisions of the laws in force, governing constructions in military zones in strongholds.

In 1894 permission was given to build a shed with an iron roof, for baggage service, in connection with the railway station, "in the concept that said work shall be destroyed for account of the grantee upon the first intimation from the military authority, when it shall deem it necessary for the defense or for other purposes of war." Under one or the other of these permits Ubarri put up the building, but no lease or other paper was executed. By somewhat similar proceedings on March 28, 1895,

Ubarri was granted the permission to put a second story on the building in question, under the Law of July 5, 1883, concerning urban constructions of a permanent character in the Marina, without other limitations than those established by municipal ordinances. The result was that the height of the building was, in all, 12 meters, according to plans signed, subject to the same conditions as the original permit of 1891, all of which was also approved by her Majesty, the Queen Regent, in the name of the King on July 4, 1895, according to Royal Order transmitted by Azcarraga to the Captain General of Porto Rico. The Queen also approved Ubarri's substitution of "the present wire fence by a wood fence in the station of the tramway from the capital of said Island to Rio Piedras."

In 1897, in accordance with Royal Orders, the walls and fortifications overlooking the lot in question were destroyed and removed, and all military easements thereupon ceased to affect the enjoyment and occupation of the said lot of land. Perhaps the court may take judicial knowledge that at this time the handsome Plazuela or Avenida de Daban with the statues and stone lamp-posts now there were constructed on the site of the Puerta de San Justo and its approaches, the Puerta de España also demolished, and the 10 meter street between the Ubarri station and the old walk filled with the débris.

### American Occupation.

The railway and the building which Ubarri had erected as a terminal on the land in controversy were in use at the American occupation of Porto Rico, first under the protocol and then under the treaty of Paris of December 10, 1898. The eighth article of that treaty declared:

United States v. Porto Rico Railway, L. & P. Co.

"Spain relinquishes in Cuba, and cedes in Porto Rico and other islands in the West Indies, in the Island of Guam, and in the Philippine Archipelago, all the buildings, wharves, barracks, forts, structures, public highways and other immovable property which, in conformity with law, belong to the public domain, and as such belong to the Crown of Spain.

"And it is hereby declared that the relinquishment or cession, as the case may be, to which the preceding paragraph refers, cannot in any respect impair the property or rights which by law belong to the peaceful possession of property of all kinds, of provinces, municipalities, public or private establishments, ecclesiastical or civic bodies, or any other associations having legal capacity to acquire and possess property in the aforesaid territories renounced or ceded, or of private individuals, of whatsoever nationality such individuals may be.

"The aforesaid relinquishment or cession, as the case may be, includes all documents exclusively referring to the sovereignty relinquished or ceded that may exist in the archives of the Peninsula. Where any document in such archives only in part relate to said sovereignty, a copy of such part will be furnished whenever it shall be requested. Like rules shall be reciprocally observed in favor of Spain in respect of documents in the archives of the islands above referred to.

"In the aforesaid relinquishment or cession, as the case may be, are also included such rights as the Crown of Spain and its authorities possess in respect of the official archives and records, executive as well as judicial, in the islands above referred to, which relate to said islands or the rights and property of their inhabitants. Such archives and records shall be carefully preserved, and private persons shall without distinction have the

right to require, in accordance with law, authenticated copies of the contracts, wills and other instruments forming part of notarial protocols or files, or which may be contained in the executive or judicial archives, be the latter in Spain or in the islands aforesaid." [30 Stat. at L. 1758.]

In 1900 the motive power was changed from steam to electricity. Amongst other changes, permission was obtained to run the loop through the city of San Juan proper, which now constitutes the main line of the railroad. The original line of the loop was an extension of the old Ubarri rails across where stands the present Federal building and over the Plazuela Daban, on the site of the old Puerta de San Justo, and along the steep incline by the city walls to San José street and the Plaza; that is, the cars ran down this incline. The old station in question then ceased to have value for terminal purposes, and came into use as an office building of the railroad company. Different extensions, switches, and connections have been made, such as an extension to the electric power plant built on Cangrejos Bay, another to the new part, followed by double tracking and the like.

## Ordinance of 1909.

After changes of ownership, application was made to the Executive Council of the American local government for an ordinance granting to the San Juan Light & Transit Company as owner the right to own, extend, and operate electric railway lines between the city of San Juan and the town of Rio Piedras, and for other purposes. This was made under § 32 of the Organic or Foraker Act, providing that "all grant of franchises, rights, and privileges or concessions of a public or quasi public nature shall be made by the Executive Council, with the approv-

al of the governor, and all franchises granted in Porto Rico shall be reported to Congress, which hereby reserves the power to annul or modify the same." 31 Stat. at L. 77, chap. 191, Comp. Stat. 1916, § 3781. This section was amended by the Act of May 1, 1900, so as to provide that "all railroads, street railways, telegraph and telephone franchises, privileges or concessions granted under § 32 of said act shall be approved by the President of the United States, and no such franchise, privilege, or concession shall be operative until it shall have been so approved," together with other provisions as to such franchises being subject to amendment, as to issue of stock for value, stock dividends, regulation of charges, and condemnation by the public authorities. 31 Stat. at L. 715. The ordinance governing the subject was passed in open session of the Executive Council May 6, 1909, and was approved by Governor Regis H. Post May 11, and by the President of the United States May 21, all of the same year. The ordinance covered the route, terminals, operation and rights of the company, and in § 1 provided for an acceptance in writing within ninety days, and that "the acceptance of this franchise by the grantee shall be accompanied by the surrender of all rights by said grantee, and of the said San Juan and Rio Piedras Railroad Company, by, through, and under said Royal Order of February 18, 1878, granting a franchise to said Pablo Ubarri y Capetillo, and all amendments, extensions, and modifications of said franchise and any other rights or concessions now owned or held by either of said companies, by whomsoever granted prior to the passage of this ordinance." The acceptance thus provided for was filed by Henry F. Ford, as attorney for the said companies under power of attorney, with the express

provision that the relinquishment called for "is intended to refer solely and only to the exercise of those public or quasi public rights which grantee and said San Juan and Rio Piedras Railroad Company now exercise; and does not refer to nor require grantee and said San Juan & Rio Piedras Railroad Company to surrender such property rights as their predecessors in interest may have heretofore acquired under said franchise, or any of its amendments, modifications, or extensions; nor to impair or in any way limit the right of the San Juan Light & Transit Company to own, control, use and occupy (subject only to the limitations fixed by the ordinance of May 6, 1900) the real estate and other property now owned, controlled, used, and occupied by it and by the said San Juan & Rio Piedras Railroad Company." The reason for this was that any other construction would "probably very materially cloud the title . . . to said property if it did not actually deprive it of the right to hold it." This acceptance was referred to the Attorney General of the Island and approved by him, and the acceptance became valid October 4, 1909, being reported by the proper committee to the Executive Council on October 14 of the same year. The ordinance in question, therefore, while superseding all previous franchises as to the operation of the road, leaves the question of title and property rights to be controlled by the Spanish papers above set out.

It was agreed by stipulation filed March 21, 1916, that the land in question has not for several years been used as a passenger station or for the purpose of depositing thereon coal, but was occupied in part by an office building of defendant and in part by tracks of the defendant, some freight being received and delivered by defendant thereon. That the United States had

fixed the rental to be paid by the company for said premises at the sum of $4,980 per annum, and due notice served upon officers of the defendant, and that said defendant refused to pay the rent or recognize the right of the United States to demand such increase, and that thereupon due notice to quit and give up the premises was served April 27, 1914. It was further agreed that defendant was the owner of the rights obtained by Ubarri, and that defendant and its predecessors had made due payment of 156.78 pesos or its equivalent to the proper authorities of Spain and the United States up to June 30, 1912, and that each year thereafter the defendant had duly tendered said sum and it was regularly refused.

The proceedings may therefore be said to show three stages: 1. The application by Ubarri and approval by the Spanish government in 1878 of his project for a steam tramway, the maps made during the building of the road showing the tracks ending at the Puerta de España. The word "concession" (concesion) is generally used. 2. The right to erect a terminal building on the land in controversy, given first in 1881 and carried out in 1891 upon subsequent application, adopting the terms of the 1881 order. In these the words "lease" (arrendar) and "rent" (alquiler) are expressly used. No formal lease was executed, but Ubarri was put in possession by the government. 3. The franchise of 1909, which in its acceptance leaves Ubarri's property rights as under the Spaniards.

## Summary.

The findings of fact may be summarized as follows:

1. That the United States, plaintiff herein, is the owner of

the parcel of land described in the amended answer, and that defendant is in possession thereof.

2. That the defendant, Porto Rico Railway, Light, & Power Company, is the assignee and grantee of all property and rights of Pablo Ubarri under a steam railway concession granted the said Ubarri by Royal Order of February 18, 1878, as amended by Royal Order of March 16, 1882, and an unwritten lease to the said Ubarri under Royal Order of January 21, 1881, to run for the same term as the said railway concession.

3. That Pablo Ubarri constructed and operated a steam tramway in conformity with the conditions of the said Royal Orders of February 18, 1878, and March 16, 1882, and that the tracks of said tramway crossed the parcel of land described in the amended answer.

4. That Pablo Ubarri and defendant as his assignee and grantee paid the sum of 156.78 pesos provincial currency, or its equivalent in American currency, yearly to the proper governmental authorities up to June 30, 1912, under the provisions of said lease in virtue of the said Royal Order of March 16, 1882.

5. That plaintiff notified defendant of an increase in rent of the said premises in the sum of $4,980 per annum before July 1, 1912; that defendant refused to pay such increased rent and made no tender of any sum other than the sum of 156.78 pesos, denying the right of the plaintiff to increase the rent.

6. That said proceedings reserved the right to the Spanish government to increase the rent upon the removal of the military easements thereon.

7. That the said military easements were removed in 1897 by destruction of the wall and fortifications overlooking the land in controversy.

8. That notice to quit and give up the premises was served on defendant on April 22, 1914.

9. That on the 16th of March, 1882, the value of the land in controversy was 0.75 pesos, equivalent to $0.48 per meter; that in 1912, and at the time of bringing this suit, the value of the land was $35 to $40 per meter.

*Mr. Miles M. Martin,* District Attorney, for the United States.

*Mr. J. Henri Brown* for defendant.

HAMILTON, Judge, delivered the following opinion:

The facts of this case are voluminous and have been given in the foregoing statement, which is the finding by the court of the facts involved. The elucidation of the law growing out of them depends upon a few leading principles.

1. It may be noted as a preliminary that there is no question that the United States, in succeeding to the rights of Spain under the treaty of Paris of December 10, 1898, did so without prejudice to the rights of citizens and property owners. The United States is bound to respect all rights of private property in Porto Rico at the time of its cession by Spain. It is the usage of all civilized nations, when territory is ceded, to stipulate for the property of the inhabitants. Such an article, so deservedly held sacred in view of policy as well as justice and humanity, is always required and never refused. United States v. Arredondo, 6 Pet. 691, 8 L. ed. 547. And this is the law, apart from treaty stipulations. Soulard v. United States, 4 Pet.

511, 7 L. ed. 938. It is the duty of a nation receiving a cession to respect all rights of property as recognized by the nation making the cession. Cessna v. United States, 169 U. S. 165, 42 L. ed. 702, 18 Sup. Ct. Rep. 304. Such a provision is expressed in art. 8 of the treaty of Paris. Indeed it is not necessary that these rights be evidenced by a formal grant of the former government. Wherever preliminary steps had been taken which would have justified that government in the issue of a grant, its successor, the United States, will be held to the same measure of duty and will act as if the grant had been actually issued.

There is no difficulty about the proof of the steps in such a proceeding. Where the United States has succeeded to territory, for instance of Spain, and to the official papers connected with grants, courts will take judicial knowledge of the duties of these officers and construe the official papers bearing on the case.

2. A preliminary question, however, arises as to the method of procedure adopted in this case. The theory of the plaintiff is that it is a landlord with right to bring ejectment for re-entry for breach of covenant by the tenant, the defendant in the case. How far this applies will be considered later; the first question is, Does ejectment lie for such purpose in Porto Rico? The usual method of re-entry for default in payment of rent is provided by § 1472 of the Civil Code of Porto Rico, which is as follows:

"The lessor may judicially dispossess the lessee for any of the following causes:

"1. Upon the expiration of the conventional period or the one fixed for the duration of leases in §§ 1480 and 1484.

"2. Default in payment of the price agreed upon.

"3. Infraction of any of the conditions stipulated in the contract.

"4. When the lessee employs the thing leased in uses or services not stipulated and which cause the same to be impaired. . . ."

This is generally spoken of as "desahucio." Porto Rico is in the anomalous position of having a Spanish Civil Code and an American Code of Civil Procedure, and the provision as to action in unlawful detainer (desahucio), and that as to ejectment (reivindicacion) both occur in the Civil Code, §§ 1472 and 1091. The Code of Civil Procedure, however, also covers claims to recover specified real property, §§ 104, 284, 290, and the act of March 9, 1905, specifically establishes unlawful detainer on behalf of owners of property entitled to the enjoyment of such property. This expressly runs against lessee. Act of March 9, 1905, §§ 1, 2, and 9, p. 184. The subject of nonpayment of rent is expressly covered by this act of 1905 (§§ 2, 9, 15), which provides for the ejectment of the defendant from the premises (§§ 16 and 18). This law has the usual repeal of laws in conflict with it (§ 19).

It may be seriously doubted whether the United States is bound by the local methods of procedure. Technically Porto Rico is a territory created by the United States as sovereign. It may be that the United States, in suing in a Porto Rican court, would be bound by the methods of procedure there prevailing, but it is not so clear that the United States, the sovereign, are bound by this in its own courts, such as the district court of the United States for Porto Rico. It is true that this court recognizes and proceeds under the local law in ordinary cases under what is called the Statute of Conformity. U. S.

Rev. Stat. § 914, Comp. Stat. 1916, § 1537. This, however, is largely upon the doctrine of comity, and the wording of the statute merely is that such practice shall conform "as near as may be." It would not apply if there was no satisfactory method of procedure provided by the local law. In the matter at bar the question of the recovery of possession by a landlord for nonpayment of rent, or for other reasons, may be at common law and in the states at large by ejectment. The existence of summary proceedings merely gives the landlord an election; it does not deprive him of his common-law remedy of ejectment. 24 Cyc. 1399. It is not perceived that there is any necessity for construing the local law, even if binding on this court in this case, so as to prevent a recovery by the United States as landlord in a suit of ejectment if it prefers to proceed in that manner. A suit in ejectment is triable before a jury, while that in unlawful detainer ordinarily is tried summarily before a judge. The two rights are alternative, and not exclusive. If, therefore, in the case at bar the United States shall be held to be a landlord, the remedy chosen is not improper.

3. It is contended that no suit of any character can be brought under the facts at bar, that the defendant's rights rest upon a grant by the government of Spain, to which the United States succeeds, and that a forfeiture for condition subsequent can only be by office found or by an act of Congress, which is the equivalent. There is no question that this is true of a grant by a government. At common law, the sovereign being unable to make an entry in person, the proceeding called an office found was necessary to determine the estate. United States v. De Repentigny, 5 Wall. 268, 18 L. ed. 646. This method of asserting or resuming the forfeited grant can be exercised by the legisla-

tive authority alone. Schulenberg v. Harriman, 21 Wall. 44, 22 L. ed. 551. The same principle is held in the cases of Van Wyck v. Knevals, 106 U. S. 360, 27 L. ed. 201, 1 Sup. Ct. Rep. 336; United States v. Northern P. R. Co. 177 U. S. 435, 44 L. ed. 836, 20 Sup. Ct. Rep. 706; and Spokane & B. C. R. Co. v. Washington & G. N. R. Co. 219 U. S. 166, 55 L. ed. 159, 31 Sup. Ct. Rep. 182; and also United States v. Washington Improv. & Development Co. 189 Fed. 674. These are all cases of grants, generally by patent or act of Congress. The contention of the plaintiff, however, is that the case at bar is not a grant of this character, but merely a suit by a landlord to recover property for nonpayment of rent, which does not rise to the dignity of a technical grant, and is governed by other principles. The word "grant" is appropriate at common law for conveyance of real rights, and the theory of "forfeiture and office found" is under the authorities applicable to real rights, and not to personal. If the government leases a room in the capitol for a lunch room, it would not require an act of Congress to eject the lessee for nonpayment of rent. Nor is the law of remedy changed because in the civil law a leasehold is a real right and to be registered when for a term of six years (Mortgage Law, § 2). It is not merely a personal right as at common law. Whether this transaction was a lease or a grant is therefore a crucial point.

4. The dealings between the government of Spain and Ubarri did not constitute a license or a tenancy from year to year. It was a cession of land to be used as a tramway terminal for the full length of time that the tramway franchise itself was to run; that is to say, for sixty years. It must be distinguished, however, from the franchise itself. The tramway might run and

United States v. Porto Rico Railway, L. & P. Co.

did run over public lands, and, from its operation by steam and otherwise, required public authorization and public supervision, all of which are implied in a franchise. The land upon which its terminal station should stand need not necessarily be public land. In point of fact, while the evidence is not full, the maps show that the original terminal was a building on the bay shore. It is clear that it was not a building erected originally upon the land now in controversy, because from military reasons no building was erected there until 1891 at the earliest. There might be a recovery by the United States in this suit without affecting the franchise of the defendant company at large. The controversy between the parties is not so much on the point of lease as upon the amount of the rent itself. The defendant admits that it is subject to the payment of rent, and until the suit was brought the United States claimed no more. The parties only differed as to amount of rent which should be collected under the contract in evidence. The Royal Order uses the word "lease" (arrendar) and must be construed to mean what it says.

5. It is perfectly true that contracts must be mutual. The United States may not be bound by the Porto Rican Civil Code, § 1223, which declares this principle, and indeed the Civil Code was not adopted in Spain until 1889, and therefore after the contract in controversy. The principle, however, is one of general law, and may be accepted as applicable to this case, with the qualification that it does not apply where the contract itself provides otherwise as to any particular term. Ordinarily the amount of rent must be certain or capable of reduction to certainty, although otherwise a landlord can recover the value of the use and occupation. Tiffany, Land. & T. §.173. Rent must be certain according to § 1446 of the Civil Code also. To

this effect is the Commentary of Manresa, vol. 4, p. 409, and pp. 44–54. This also is general law, and may be accepted, with the above qualification. The lease of January 21, 1881, has several provisions as to the buildings to be erected, and then provides: "Sixth: That the lots should not be ceded gratuitously, but they are to be leased under such circumstances as may be deemed to be acceptable, turning into the Insular Treasury the rent as contingent revenues thereof." There is then added that "at the same time it is the will of his Majesty that your Excellency (the Governor General) be authorized to make the proper orders to carry into effect the said lease." The amount of rent, therefore, was to be fixed by the local Spanish government in Porto Rico; and the facts show that after a good deal of reference from one bureau to another it was finally fixed at 156.-78 pesos, which has been paid ever since up to 1912. The contention of the defendant is that, being once fixed, it could not be changed afterwards at the caprice of the landlord, as otherwise it would be an ambulatory contract, and lack the certainty necessary for all contracts. Certainly all instruments are to be construed so as to give them a definite effect.

There seems to be no doubt that the Spanish government fixed this low rent because the lots in question were at the time of the lease under the guns of the city wall, that is, subject to military rules as to the plane of firing and the like; and the report of Engineer Maese, whose admission was objected to by the defendant, was that the price could and should be raised when the circumstances changed; that is to say, when the land had ceased to be subject to military provisions. It is not clearly shown, however, that this was brought to the attention of the lessee, Ubarri. The evidence shows that there was registered in expediente form

"land belonging to the state which his Excellency Don Pablo Ubarri occupies with the tramway and materials belonging to the same at the place called La Carbonera from the Puerta de España at the left of the road next to the wall near the Castle or Battery of San Francisco de Paula—1885,—property No. 48." In this expediente are found inscriptions of this property No. 48 "composed of 4,181 square meters valued at 3,135 pesos, 75 centavos, of which his Excellency Don Pablo Ubarri has the use upon the payment of the annual rent of 156 pesos, 78 centavos." In 1887 in the same expediente is the report of the register of property dated March 18, 1887, which seems to show that the above was registered in the registry of property. The Mortgage Law was not adopted in Spain until 1893, and was made effective the same year in Porto Rico, and under this, in compliance with art. 43–50 of the Regulations for the Enforcement of the Mortgage Law, and for the effect described in the second part of art. 52, there seems to have been an inscription "March tenth one thousand eight hundred eighty-seven." The former expediente contained the rent fixed as above, but the one under the Mortgage Law, while describing the origin of the property and saying that since 1849 the Treasury had been in the uninterrupted possession, renting the property at an annual rental, and that it is used for the present for the station of the tramway as authorized in 1881, and giving boundaries, does not give the amount of the rent, and adds, "There being no other data set forth in regard to the said lands which should be mentioned." Under these circumstances, was Ubarri chargeable with notice of the variable nature of his rent? If he is chargeable only with the record under the Mortgage Law just given, then there is nothing said about amount of rent at all, and it would be by all

IX. Porto Rico.—25.

the papers making up the contract—for a formal lease does not seem to have been executed—a matter entirely left under the provisions of 1881, that is to say, "leased under such conditions as may be deemed to be acceptable." This means acceptable to the government, for the proceedings fixing it show that the amount was fixed by the government, and Ubarri had nothing to do with it upon the face of the papers. On the other hand, if the inventory of 1887 is to be given force, fixing the amount of rent at 156.78 pesos, it is impossible to see why the other public expedientes contemporary with the lease are not also to be taken into account. The result must be that Ubarri accepted this land knowing that it was under fire of the fortifications, and therefore for the time being granted him at a low rent, subject to being raised at the cessation of these disadvantages.

6. The defendant, however, contends that if this is true, the change of rent could only be made when the change of military situation occurred, that is to say, as shown by the evidence in 1897; and that, as the Spanish government made no change of rent at that time, none could be made afterwards. That is to say, that the government, whether it be of Spain or of the United States, is estopped from making any change in the rent. It is true that while the United States is exempt from suit, it is not exempt from the incidents of suing. That is to say, if the United States chooses to sue, it is bound by estoppel the same as other parties. While it is exempt as a defendant, it can sue only as other plaintiffs. Roberts v. Northern P. R. Co. 158 U. S. 1, 39 L. ed. 873, 15 Sup. Ct. Rep. 756; Branson v. Wirth, 17 Wall. 32, 21 L. ed. 566. Where a state claims title, it takes cum onere and subject to all estoppels running

with the title. Carver v. Jackson, 4 Pet. 1, 7 L. ed. 761. In this respect the United States is a sovereign, and in the same way subject to the same liabilities as any other state.

7. It is not clear, however, that estoppel in pais is binding at law as to land, although it is binding in equity. Kelly v. Hendricks, 57 Ala. 193; Allen v. Kellam, 69 Ala. 442, 443; Harris v. Miller, 71 Ala. 27. In no event does estoppel arise unless the silence or acquiescence of one party is acted upon by another. Moore v. Robinson, 62 Ala. 537, 546. The plea of estoppel is not favored at law (Stephen, Pl. 353), although the defense is not now considered odious. Caldwell v. Smith, 77 Ala. 157, 158. The grantor is estopped from denying the pecuniary consideration recited. Williams v. Higgins, 69 Ala. 517. But the case at bar is one seeking to estop the grantor from denying a pecuniary consideration which is not recited. Estoppel, if it applies in this case at all, will apply, therefore, only if it is shown that the defendant relied upon the rent remaining at 156.78 pesos, and did some act upon this basis to his disadvantage. Estoppel even in equity is a kind of executed contract. Bispham, Eq. § 129. The facts do not show that there has been any change to the disadvantage of Ubarri or his successors. So far as appears, there has not even been a new office building erected. The same story and a half building erected under the original conditions, apparently as a railway shed or depot, appears to remain, and there is no equitable right and no reason for estoppel against the government in the matter. If in 1898 under either Spanish or American régime, Ubarri had made changes in his building or in the use of the land, the case might be different. Changes indeed have been made, but they have been made away from this land. While the acquiescence of the

government for so long would prevent its taking advantage—if, indeed, it could do so at any time—of the different use of the property now from what was contemplated in the lease, this liberality should not be construed against the United States and it be deprived in 1912 of a right which perhaps the then existing government could have exercised in 1897. That the public authorities, of whatever nationality, have voluntarily deprived themselves of several thousand dollars annual rent for fourteen years does not give the defendant any vested right for this oversight to continue for the rest of the sixty years. Ubarri and his · representatives must be content with the advantage which they have already acquired.

8. The result, therefore, is that in 1912 the landlords had a right under all the circumstances of the case to refix the rental. If they fixed this rental at a higher figure than the facts justified, then they would indeed be transgressing the contract to which they succeeded; and not only would the defendant be perfectly justified in refusing to pay the increase, but his tender of the proper amount would defeat the right of the landlord to recover possession. The testimony in the case shows that the property would reasonably be valued in 1912, as at present, at about thirty or forty dollars per square meter. All the 4,181 meters leased under the Spaniards, however, is not in controversy. This suit is only for 2,074 square meters, and the answer admits possession of 1,248.24 square meters. What has become of the surplus is not in evidence. There being no evidence as to amount in possession of the defendant, the plaintiff's recovery, if it recover, can be only for the amount admitted. The limitation of the amount of land in controversy to this admission, however, has effect going further back than the land to

United States v. Porto Rico Railway, L. & P. Co.

be described in the judgment. The Spanish lease was based upon 5 per cent of the value. Whether this rate is a part of the contract need not be decided, because there is no evidence as to the propriety of any other rate. If the evidence is to be interpreted that the government demanded $4,980 for the rent of 1,-248 square meters, worth perhaps $50,000, it would be demanding practically 10 per cent. This would therefore be improper under the evidence showing 5 per cent as the right rate. However, the demand of the government was for $4,980 rent for 2,074 meters, and this would be practically at a 5 per cent valuation, and so would not be affected by the fact that, as it turns out, the actual amount of land withheld is 1,248 meters. Moreover, as the pleadings stand, the defendant refused to pay anything over the 156.78 pesos, that is to say, refused to pay any raise at all, and thus put itself in default. It was therefore subject to a declaration of forfeiture by the landlord and a suit for possession of land as in the case at bar.

It follows that the United States is the landlord, that it had the right to refix the rent, that the amount as so fixed is within its rights under the contract, that this amount has not been paid, and therefore it is entitled to recover the land admitted in the answer. No claim is made in the complaint for rents at the old or the new valuation, and it therefore would be impossible to allow any rentals but for the fact that they have been tendered. This is as binding as an amendment of the pleadings. The amount of the tender cannot be disputed by the defendant, and hence judgment will run at that rate since June 30, 1912. This amount is the equivalent of 156.78 pesos Spanish provincial money, and the court judicially knows that such peso was and is equivalent to 60 cents, as fixed by a military

United States v. Porto Rico Railway, L. & P. Co.

order of President McKinley January 20, 1899.  4 Laws, etc., effective in Porto Rico, p. 2440.

A judgment will be entered accordingly.